51 N.J. Super. 368 (1958)
143 A.2d 860
BENJAMIN EDELSTEIN, PLAINTIFF-APPELLANT,
v.
CITY OF ASBURY PARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND ASBURY PARK ENTERPRISES, A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS, AND SEBASTIAN P. VACCARO AND ROSEMARIE VACCARO, DEFENDANTS, CONSOLIDATED WITH SEBASTIAN P. VACCARO AND ROSEMARIE VACCARO, PLAINTIFFS,
v.
ASBURY PARK ENTERPRISES, A CORPORATION OF THE STATE OF NEW JERSEY, AND CITY OF ASBURY PARK, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND J. OLIVER ARMSTRONG, CITY MANAGER AND DIRECTOR OF PUBLIC WORKS OF THE CITY OF ASBURY PARK, DEFENDANTS-RESPONDENTS, AND BENJAMIN EDELSTEIN, PETITIONER FOR INTERVENTION-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued June 16, 1958.
Decided July 16, 1958.
*371 Before Judges STANTON, HALL and GAULKIN.
Mr. Benjamin Edelstein argued the cause for appellant, pro se (Messrs. Edelstein & Edelstein, attorneys).
Mr. Charles Handler argued the cause for respondent Asbury Park Enterprises (Mr. Alan B. Handler on the brief).
Mr. Ascenzio R. Albarelli argued the cause for respondent city of Asbury Park.
The opinion of the court was delivered by HALL, J.A.D.
These consolidated appeals represent the latest chapter in the litigation involving the sale by the City of Asbury Park in 1954 of a parcel of land known as the "Coleman House Tract." The sale was rescinded some three and a half years later through the medium of a consent judgment entered into by the city and the purchaser. We are concerned with the propriety of the dismissal, on procedural grounds, and without a hearing on the merits, of a taxpayer's attempted attack on the rescission.
To put the questions presently involved in proper focus, the history of the matter must be summarized, which we derive from our examination of the files in the prior litigation as well as the record before us in the present appendices.
The city-owned piece in question constitutes about half of the block bounded by Ocean Avenue on the east, First Avenue on the north, Kingsley Street on the west, and Asbury Avenue on the south. It is L-shaped and fronts approximately 250 feet along Ocean Avenue, 350 feet along Asbury Avenue (occupying the entire length of the block on both of these streets), about 125 feet along First Avenue, which also represents the depth of the Ocean Avenue frontage, and about 65 feet on Kingsley Street, similarly measuring the depth of the land along Asbury Avenue. The remainder of the block, fronting only on First Avenue and Kingsley Street, has been owned since 1950 by Sebastian P. Vaccaro and wife (whom we shall hereafter refer to as "Vaccaro"). *372 The lot, the former site of a hotel known as the Coleman House, is a valuable parcel, occupying a prominent position at the southerly entrance to the beach front area. The entire block had been vacant for a number of years prior to 1954. Both the city and Vaccaro were renting their respective portions for parking lot purposes. The former had been desirous for some time of selling its part to restore the property to the tax rolls with a substantial ratable and apparently at the same time to bring about the erection of a building or buildings thereon of appropriate and attractive appearance in view of its prominence in relation to the beach front and boardwalk area. It had received several offers over the years but, as the city manager said in an affidavit in 1954 in one of the earlier stages of the litigation, "the Mayor and Council have refused to sell this lot except for the erection of a certain specific type of building because said lot is located at a corner which is very valuable and also on a corner which is the entrance to the Asbury Park beach front." Vaccaro was one of those interested in buying the lot to combine with his property, and in November 1953 he submitted an unacceptable proposal through his then counsel, the firm of Edelstein and Edelstein, of which appellant Benjamin Edelstein is a member.
By letter to the mayor and council dated December 8, 1953, Michael Weinstein Agency, a local real estate firm, advised of an unnamed client (who turned out to be one David Cronheim) interested in purchasing the site. No price was named but the following conditions were offered:
"It is proposed to build a modern 8 story fireproof apartment house fronting on Ocean Avenue, including a group of stores; the building to consist of approximately 300 rooms divided into 80 apartments; covering an area of approximately 11,500 square feet; and agree to the follow all [sic] conditions, and with the usual setbacks from Asbury Avenue and First Avenue. They will also agree that a parking area for approximately 50 cars will be provided." (Emphasis ours)
The significance of this proposal later appears. It now should be noted that the proposed apartment building would *373 necessarily occupy substantially all of the Ocean Avenue frontage and depth after allowing for zoning setback and yard requirements and parking area.
On February 19, 1954 Vaccaro, jointly with another, submitted a new offer to purchase the lot for $25,000 on condition that the city grant permission to erect a structure (expressed very generally) to consist primarily of apartment and hotel accommodations with a group of stores at the street level estimated to cost approximately $1,000,000.
There were informal conferences and negotiations on the Weinstein proposal with the governing body which culminated in the submission of a formal offer from Weinstein on behalf of Cronheim on March 9, 1954 to purchase the property for $85,000 in cash, subject to detailed covenants and restrictions, those presently pertinent reading:
"1. The successful bidder shall apply for and obtain a building permit from the City of Asbury Park for the erection of not less than a seven story stores and elevator apartment building on the land facing Ocean Avenue and one story stores on Asbury Avenue.

* * * * * * * *
5. The successful purchaser shall provide parking facilities in excess of the apartments that are constructed.
6. As an alternate, the City will permit the successful bidder to erect part hotel suites and hotel rooms if he so desires." (Emphasis ours)
While stores of one story on Asbury Avenue are here first introduced, it seems reasonable to assume the offeror was still talking about the same general kind of building along Ocean Avenue as more specifically described in the initial proposal, at least to the extent that any structure on that street was to be multi-story and not single-story.
There were further conferences and negotiations. The governing body, in private session rather than in public meeting, determined to make the sale to Cronheim and reject the Vaccaro proposal. Consequently at the meeting of the mayor and council held April 22 the city Manager reported the receipt of the Cronheim bid and requested permission to advertise the property for sale, "with terms and conditions *374 to be set forth." Authority was given, amounting to approval of the offer, with final action fixed for the council meeting of May 11.
The proposed sale was to be made under the authority of subsection (c) of R.S. 40:60-26 as amended, permitting a municipality to sell land not needed for public use at private sale, upon receipt and approval of an offer and subject to final action of confirmation at a further public meeting of the governing body not less than 10 days thereafter, with advertised notice thereof, "provided, that no higher price or better terms shall then be bid for said property by any other person, in which case the sale is to be made to the highest bidder * * *." The statute further permits the governing body to "impose any restrictions on the use to be made of such land and any conditions of sale as to buildings or structures to be erected thereon, or as to the type, size or other specifications of such buildings or structures * * * or any other conditions of sale in the manner and to the same extent as any other vendor of real estate * * *." In private sales made pursuant to subsection (c), it is obvious, and in fact frankly conceded in this case, that the detailed terms and conditions which appeared in the advertised notice, are not imposed by the municipality in the usual sense, but originate basically with the offeror and then are negotiated and finally agreed upon between the municipality and the prospective purchaser in advance of the formal action. The frequent practical result is that there is no other bid at the time fixed for confirmation, in view of the short space of time between the two meetings and especially where the specified terms and conditions are numerous, precise and narrow. While theoretically the procedure provides for competition, in practice there is frequently none. The protection of the public interest from favoritism, fraud or inadequacy of price must come from good faith, conscientiousness and hard-headedness of the governing body in the advance negotiations and in continued diligence after the sale to assure that conditions and restrictions are adhered to and carried out.
*375 The full terms and conditions of sale set forth in the advertised notice were generally much more detailed, and in some respects different, from the letter of March 9. As to terms of payment, they called for $25,000 in cash to be paid at the time of confirmation, payment of an additional $10,000 in cash on execution of a contract of sale, which was to be delivered no later than five days after confirmation, and the balance of $50,000, in cash or by purchase money bond and mortgage payable in five years, to be delivered at the closing of title, which was required on or before October 1, 1954. The use of the premises was specified and restricted in the following language:
"The successful bidder shall apply for and obtain a building permit from the city of Asbury Park [within 8 months from the date of the deed] for the erection of an elevator apartment or apartment hotel building of not less than seven stories on the land facing Ocean Avenue and a building consisting of not less than one story store building on the land facing Asbury Avenue, costing not less than One Million ($1,000,000) Dollars." (Emphasis ours)
Note that a minimum cost requirement appears for the first time, and that the restriction as to the building to be erected on Ocean Avenue was phrased substantially like the March 9 letter, but without the right to have stores therein.
It was further provided that, upon the closing of title, the purchaser must deposit with the city cash or surety company bond in the sum of $200,000, conditioned upon the fulfillment of all of the covenants and restrictions and upon the erection and completion of the building or buildings within a period of two years from the date of the passage of title.
On May 11 the mayor and council passed a resolution ratifying the sale to Cronheim, no other bids being made. Three days later Vaccaro, through Edelstein, notified the governing body that the sale was defective since more than ten days had elapsed between the publication of the notice and the date of the sale in violation of the statute. So, on May 18 the sale was rescinded, and a new offer from Cronheim received and accepted, subject to confirmation at the meeting of May 28. The new offer was upon the same covenants, *376 conditions and restrictions as the former one, except that stores were to be permitted on the street level of the apartment building on Ocean Avenue. The new advertisement made the single change to rephrase this use restriction to require "the erection of an elevator apartment or apartment hotel building of not less than seven stories with stores on the street level on the land facing Ocean Avenue and a building consisting of not less than one story store building or store and apartment building on the land facing Asbury Avenue, costing not less than $1,000,000." (Emphasis ours) This change reverts substantially to the language of the March 9 letter, again appearing to indicate that any structure along Ocean Avenue was to be multi- and not single-story. On May 21 Vaccaro, through Edelstein, protested the sale, charging that the notice was ambiguous and not in compliance with the statute. At the meeting on May 28 there were no higher bidders or other offers and a resolution was adopted confirming and ratifying the sale, subject to the advertised terms and conditions, after Edelstein announced that he had filed suit for Vaccaro to attack the sale.
The day following, Vaccaro actually instituted his action in lieu of prerogative writ (Docket No. L-9047-53). The city and Cronheim moved for summary judgment and the Law Division granted the motion, its order of August 27, 1954 reciting that the court found that the plaintiffs' complaint "does not set forth a cause of action." This judgment was not appealed and the validity of the sale was thereby finally established. Thereafter Edelstein ceased to represent Vaccaro.
The cash payments were duly made by the purchaser and, by deed dated October 1, 1954, title was conveyed to Asbury Park Enterprises, Cronheim's assignee and a corporation of which he was president, which delivered a $50,000 mortgage, bond securing it, and the performance bond. The deed repeated the covenants and restrictions and recited that they "shall be construed to run with the land to the end that no structure or structures other than those mentioned above shall be built upon said premises, and said premises shall be *377 used for no other purpose than that above set forth." The corporation (by which word we will hereafter generally designate Asbury Park Enterprises) then went into possession. It leased the land for a parking lot and during the next three years netted a profit of about $9,000 after paying taxes and mortgage interest, without regard to expenses incurred in connection with the proposed building operation.
It was not until September 20, 1955 that the corporation applied for a building permit. The plans were approved by resolution of the mayor and council on November 9, over Vaccaro's protest (now represented by other counsel), and the permit was issued by City Manager Armstrong on November 11. Shortly thereafter Vaccaro instituted the suit (Docket No. C-649-55) which the second of the present consolidated appeals involves. His action sought to set aside the resolution of approval of the plans and the issuance of the building permit, together with injunctive relief, on the ground that the proposed structures were in violation of the sale conditions and restrictions. Defendants moved for summary judgment before answer filed and the motion was granted. Vaccaro appealed and this court reversed the judgment by an opinion of Judge Waesche filed October 26, 1956 and reported in 42 N.J. Super. 288. Since the scope and impact of that opinion are of considerable pertinence on the questions presently before us, it is necessary to describe what was there involved. (Our historical recital to this point has come principally from the record therein).
The application for the building permit and the accompanying plot plans definitely show the proposed erection of two distinct, but adjoining buildings: one, a seven-story apartment building approximately 69 feet square, on the very corner of Ocean and First Avenues, with a store therein projecting some 15 feet to the south to a height of one story only; and second, a one-story store building running from thence south along the remainder of the Ocean Avenue frontage and continuing west along the whole of the Asbury Avenue frontage. The multi-story apartment building was to contain only 43 apartments totalling 126 rooms and would *378 occupy no more than 5,000 square feet and less than one-third of the frontage along Ocean Avenue, with the balance thereof comprising the separate but contiguous single-story structure.
The burden of the Vaccaro complaint was that the construction of the apartment building on only 69 feet of the land facing Ocean Avenue instead of on all of the frontage, and the erection of single-story stores not contained in the multi-story building on the remainder of that frontage, constituted violations of the restrictions and conditions imposed by the terms of sale and the deed.
The motion of the city and the corporation for summary judgment was placed upon the ground that the complaint failed to state a claim upon which relief could be granted. Their position, both before the lower court on the motion and in this court on Vaccaro's appeal, was that the question of required and permissible use of the Ocean Avenue land was one of construction of the language used in the terms of the sale and repeated in the deed, i.e., a question of law for the court. They presented to the court as proofs in support of the motion only identical affidavits of the mayor and two of the councilmen in office at the time of the sale in 1954 (and then still in office), together with an affidavit of Weinstein, all to the effect that there were no discussions, representations or understandings prior to the sale as to the location or extent of the apartment building with relation to the total Ocean Avenue frontage; that they were interested in a large hotel or apartment building on the tract "with stores associated therewith" to result in an improvement costing at least $1,000,000 and consequent increased tax returns, and that the plans submitted and approved complied with their "understanding of the Agreement and the Deed in all respects."
Vaccaro, in opposing the motion, took depositions of the mayor and two councilmen and other city officials, not going into the matter of their state of mind or subjective conception of the meaning of the language used in the instruments, but rather to the surrounding circumstances at the time, *379 introducing in evidence thereby the proposal of December 8, 1953, the offer of March 9, 1954, the minutes of the subsequent council meetings, notices of sale and the like, all as heretofore referred to. He also took the deposition of Councilman Shebell, likewise in office in 1954, who had voted against the resolution approving the plans for the reason expressed by him at the November 9 council meeting that the apartment building was not "what originally stated" and that the corporation "should build a decent building." In his deposition Shebell reiterated that the purchaser had represented that the apartment building would be a substantial structure built along Ocean Avenue and not just a small section of it, the store building would be constructed along Asbury Avenue, and the former would cost the major portion of the $1,000,000.
From all of the proofs there is a clear inference that the sale at $85,000 was not just a sale of land at fair market value, since it was very likely worth considerably more, but a special transaction at that price in order to procure, for the benefit of the city, an appropriate and substantial improvement.
The trial judge held, in granting defendants' motion, that the plans approved "encompassed the meaning and intent as this Court reads the provisions as a matter of law." Defendants' counsel had indicated in argument that all the available pertinent evidence on the meaning of the restrictions was before the court by the affidavits, depositions and the like.
The matter was argued to this court, on Vaccaro's appeal, on the same theory. Judge Waesche's opinion of reversal is positive in its language:
"It is presumed that the governing body of Asbury Park in imposing the above limitation on the use of Lot 1, Block 145, where it faces Ocean Avenue, knew what they were doing, and that they acted in good faith for the benefit of the public. * * *
It appears from the affidavits of the city councilmen that they did not think there were any restrictions against the erection of a one-story building on that part of Lot 1 facing Ocean Avenue, and that they, as members of the governing body, did not intend to impose any such restriction on the use of the lot. The fact is, however, that *380 the land was advertised, sold and conveyed subject to such a restriction. The councilmen are required to display such intelligence and skill as they are capable of in discharging the duties of their office, and to be diligent and conscientious, Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433 (1952). Since it is obvious to anyone reading the advertisement of sale that the purchaser of the lot would not be permitted to erect thereon a one-story building facing Ocean Avenue, it must be assumed that the councilmen themselves knew of that restriction on the use of the lot since they themselves authorized the advertisement, and passed the resolution selling the lot subject to the restriction. Therefore, either the notice of sale was a legal fraud on the public because it misrepresented the actual conditions of the sale, and that the conditions were not imposed for the public benefit; or the issuance of the permit in violation of the conditions of sale is a legal fraud on the public. The legality of the sale of the land, subject to the aforesaid restriction, is not challenged and, until it is set aside, it must stand as an act done in the public interest, and one authorized by law. Hence, it follows that the issuance of the permit in violation of the conditions of the sale constitutes a legal fraud on the public.
* * * The Legislature has given to municipalities the power to restrict the use of land which they may sell and convey pursuant to statute, but the Legislature has not given the power to waive any restriction which a municipality has imposed on the land as a condition of its sale after the land has been sold and conveyed. The power which a municipal corporation is authorized to exercise is intended for the common good of the inhabitants of the municipality, and not for the particular advantage of one individual. For this reason, any exercise of power must serve a public purpose in order to be legal. Consequently, the legislative policy is to control and limit the power granted to local governing bodies in order to prevent public fraud and favoritism, Waszen v. City of Atlantic City, 1 N.J. 272 (1949). If a municipal governing body could waive a restriction which it imposed on land as a condition of its sale after its sale and conveyance, the door would be wide open for fraud and favoritism. * * *" (42 N.J. Super. at pages 294, 295, 296-297). (Emphasis ours)
It was thereby expressly held that the clear meaning of the restrictions prevented construction of a one-story building on Ocean Avenue, that frontage being limited to the multi-story apartment structure with stores permitted on the street level thereof. The opinion did not hold that the apartment building had to occupy all of the available Ocean Avenue frontage, but rather that only a multi-story structure could be erected along it, with Asbury Avenue specified as the exclusive location for single-story use.
*381 While this court's opinion directed a remand along with the reversal, it appears clear that the entire case had been decided and there was no triable issue remaining in the lower court. Vaccaro would have been entitled to judgment setting aside the resolution approving the plans and the issuance of the building permit on an appropriate motion based on the entire record, but none was made. The next step, after the lapse of some time, was a substitution of attorney to present counsel for the corporation and separate notices of motion by it and the city for leave to file answers and a cross-claim by the corporation against the city. The motions were granted by order dated March 7, 1957. We are told Vaccaro opposed the motion, but the record does not show whether this opposition went only to the filing of the answers out of time or to the cross-claim as well. It would appear doubtful that he had any standing to contest the latter since he was not proposed as a party to it.
The answers were identical and further demonstrated the absence of any remaining triable issue, since the defense asserted therein was that the "structure proposed to be erected was not in violation of the restrictions and conditions as understood by the parties at the time the same were entered into."
The corporation's cross-claim sought rescission of the sale, apparently on the theory of mutual mistake, alleging: "the plans as submitted and approved conformed with the conditions as contemplated by the parties at the time of the negotiations leading to the sale"; "the decision of the Appellate Division, which is contrary to the understanding of the parties in regard to the plans as above stated, leaves the conditions without any reasonable certainty as to their construction and as to the erection of a building or buildings within the so-called conditions of sale * * *"; and "* * * by reason of the pending litigation and uncertainty as aforesaid it would be burdensome, legally uncertain and financially detrimental to proceed under the present circumstances. * * *" The city's answer thereto practically amounted to an admission of the corporation's allegations.
*382 In May 1957 the personnel of the governing body of the city substantially changed as a result of a municipal election, Councilman Shebell, who became mayor, being the only former member remaining, and a new municipal attorney was appointed. At the argument before us the latter indicated that he suggested to the governing body the entry of a consent judgment in view of the continued expense of the litigation to the city and the fact that, by reason of it, no building had yet been commenced on the land to bring to the city the substantial tax ratable it sought. Apparently conferences ensued, with the result that on September 24 the mayor and council adopted a resolution authorizing the city attorney to enter into a proposed consent judgment, already agreed to by Vaccaro and the corporation. The judgment provided that the resolution of November 9, 1955 approving the building plans and the permit issued pursuant thereto be set aside as prayed for by Vaccaro in his complaint, and that the sale of the premises to the corporation pursuant to the resolution of May 28, 1954 be rescinded and the deed declared null and void "for the reasons set forth in the cross-complaint." It went on to direct that the corporation reconvey the premises to the city, upon delivery of the deed the city simultaneously to deliver to the corporation the mortgage endorsed for cancellation, together with the bond it secured, and the performance bond, and that the city repay to the corporation the cash payment of $35,000 out of municipal funds if available, or if not, by provision therefor in the 1958 city budget, the repayment not to bear interest unless unpaid by March 1, 1958. It further ordered that "the proper costs of the defendant Asbury Park Enterprises incurred in and about the sale, including taxes and interest on its mortgage paid to the City, professional fees, loss of use of its funds, and the like, shall be considered in lieu of the reasonable value of its use and occupancy of the premises, and that upon the payment aforesaid and transfer of the instruments hereinabove provided for, the defendants Asbury Park Enterprises and the City of Asbury Park be discharged of all claims whatsoever against each other." *383 The judgment was duly signed by the Chancery Division judge under date of October 6. (The date appears to be an error since the 6th was a Sunday). It was filed October 9.
Finally, we come to the litigation giving rise to the present matters before us. On the same day the consent judgment was filed, appellant Edelstein, as a taxpayer and on behalf of all other taxpayers, filed a complaint in lieu of prerogative writ against the city in the suit which the first of the present appeals involves, seeking to set aside the resolution of authority to enter into the judgment, on the ground that it was "unwarranted, arbitrary and illegal." Before he commenced the action he communicated with the city attorney who advised him, in good faith, that the judgment had not then been signed, as far as his knowledge went, and on October 8 he gave notice to the mayor and council that he was filing the suit. Subsequently the complaint was amended (or more properly supplemented) to set up the filing of the judgment, bringing in Vaccaro and the corporation as parties defendant, and additionally praying that the judgment be set aside as far as the city was concerned. The latter's answer simply denied the invalidity of its action and did not set up any procedural objection. Vaccaro failed to answer and a default was entered. The corporation did not answer, but moved for summary judgment, as did the city, and also plaintiff by counter-motion.
At this point we should note that, despite the pendency of the litigation, the parties have moved to carry out the judgment. We understand the property has been reconveyed and provisions made to deliver the mortgage, endorsed for cancellation, along with the bond which secured it and the performance bond, technically in default, and to satisfy the cash repayment if, in fact, such have not actually been accomplished.
Defendants' motions for summary judgment were on the ground that there was no genuine issue as to any material fact. No procedural ground was urged in the motion papers or on argument. The affidavits in support of the city's motion did not verify or suggest any mutual mistake, but *384 stated only the opinion of Mayor Shebell and one councilman that the continuous litigation was not in the best interests of the city and that the purpose of the consent judgment was to terminate it so that "the premises could be readvertised for bidding and therefore be put on the tax rolls." The corporation's motion papers made an inferential, but vague, attempt to verify the cross-claim and urged the contention that Edelstein's action was barred because all taxpayers had been represented by Vaccaro and the judgment to which he consented was therefore res adjudicata.
The Edelstein affidavits opposing defendants' motions and in support of his own set forth facts to dispute the claim of any mistake in the expression of the conditions and restrictions and the basis for rescission on that ground. It was stated that there was no genuine issue raised by the cross-claim which could be compromised by the city and that to permit it to stand would be in derogation of the public interest, since the city could not be placed in statu quo because of existing economic conditions, the corporation was permitted to retain profits derived during its period of ownership, and the performance bond was surrendered even though in default.
These were the issues argued when the motions came on for hearing before the assignment judge. During the course of the argument the judge himself raised the point that plaintiff was really attacking the consent judgment and so should have applied to the Chancery Division to intervene in the Vaccaro suit in which it had been entered. On his own motion, after indicating that plaintiff had been very persuasive that the case should be heard on the merits, he transferred the action to that Division, without deciding anything and with the motions still pending.
The motions were promptly renoticed and reargued there on the same papers and a transcript of the hearing before the assignment judge. At the same time plaintiff moved there to further amend his complaint to allege that the *385 authorizing resolution of the governing body was also a gift of the city's funds to the corporation and a legal fraud on the taxpayers. This application was never passed upon.
The conclusions of the Chancery Division judge on the motions are not at all clear, but it is most certain that he never reached the merits. He granted defendants' motions and denied plaintiff's, apparently on the procedural basis that plaintiff should have sought to intervene in the Vaccaro suit to appeal the consent judgment. Plaintiff immediately made application to intervene in that case with a proposed complaint in intervention, generally following that previously filed in the Law Division, in which he sought to have the authorizing resolution and the consent judgment set aside on the same grounds as had been previously urged and also alleging that the interest of taxpayers generally was not adequately represented by Vaccaro by reason of the latter's special interest in the consent judgment. Vaccaro did not appear; defendants opposed the motion. The trial judge summarily denied the application on the ground that Edelstein's only right to intervene was for the purpose of appealing the consent judgment and that the time therefor had expired.
His present appeals are from the granting of defendants' motions for summary judgment, the denial of his similar motion, and the denial of his application to intervene.
It was clearly erroneous for the lower court to dispose of plaintiff's attack on procedural grounds, i.e., to hold first that he had taken the wrong procedural course, and then, when the suggested avenue was sought to be utilized, to say that he was out of time. It should not have to be said again that one of the prime objects of our new judicial system and the rules implementing it was to do away forever with the determination of cases on the basis of procedural niceties to the end that causes may be justly and expeditiously determined on their merits. Handelman v. Handelman, 17 N.J. 1, 11 (1954); X-L Liquors, Inc., v. Taylor, 17 N.J. 444, 454 (1954). To shunt a litigant from court to court and from proceeding to proceeding, even more *386 especially in a matter of public concern, he only to find in the end that he has fallen between procedural millstones without the merits of the claim having been considered, is reminiscent of times when the choice of the wrong prerogative writ could be fatal. "* * * [S]ince justice is the polestar our procedures must ever be moulded and applied with that in mind." Yannuzzi v. United States Casualty Co., 19 N.J. 201, 212 (1955).
Here plaintiff's action in lieu of prerogative writ, attacking only the municipal resolution authorizing the execution of the consent judgment and commenced on the same day that judgment was filed, was then entirely proper and most timely. Following the amendment adding a purported attack on the judgment itself, the city and the corporation made no objection to the forum or the procedure by way of answering pleading or in their motion (see R.R. 4:12-2) and the question was not raised until more than three months after the suit was instituted.
While the situation was somewhat unusual, we conceive that it can well be said that there was adequate basis for both the maintenance and continuance of the independent action in the Law Division under the circumstances here present. We repeat that plaintiff was actually attacking the legality of the municipal action authorizing the city's giving its consent to the entry of the judgment, and really only that part of it rescinding the sale. If the resolution was invalid, that portion of the judgment would then have to fall. The situation was fundamentally no different than an attack on the validity of any other governmental action. Plaintiff was a stranger to the judgment and his attack was not direct so as necessarily to require the procedure specified by R.R. 4:62-2 (which, by the way, expressly saves the power of a court to entertain an independent action to relieve a party from a judgment) in conjunction with the intervention rule (R.R. 4:37). Both lower court judges seem to have misapprehended this basic nature of the suit. The situation was not one mandatorily calling for proceeding only in the suit in which the judgment was entered, as was *387 the case in Joseph Harris & Sons, Inc., v. Van Loan, 23 N.J. 466 (1957).
This is not to say that the Law Division judge did not have the right to transfer the matter to the Chancery Division, in view of its ultimate and close relation to the judgment entered there in the Vaccaro suit and in the interest of orderly and expeditious determination, under the broad power given by R.R. 4:41-3. But in doing so he might most properly, again in the interest of expeditious administration of justice, have ordered it consolidated with the Vaccaro suit under his powers as assignment judge (R.R. 4:43-1(a)), or perhaps, since he conceived intervention therein to be the most efficacious means of hearing the controversy, have given plaintiff the option of having his complaint treated as a petition for intervention as of right under R.R. 4:37-1. (The suit, having once been transferred, will not be transferred back. R.R. 4:41-3). It goes almost without saying that the action of the Chancery Division judge in dismissing the transferred action because plaintiff should have sought relief by intervention was completely unwarranted and contrary to the elemental purpose of our practice. Assuming he felt, as had the Law Division, that intervention was the most advisable procedure, he should have then and there treated the amended complaint as an application for such. His expression that plaintiff's remedy, as an intervenor, was to appeal the consent judgment again misconceived the basic nature of the attack. Plaintiff could not, and was not, contending that the judgment was bad on its face. Extrinsic proof was first required to determine the illegality of the municipal resolution. A mere appeal from the judgment would have been completely futile.
We agree that intervention in the Vaccaro suit was also another means available to plaintiff (cf. Korff v. G and G Corp., 21 N.J. 558, 567 (1956)) but, as has been indicated, not the exclusive one. He should have been permitted to intervene under R.R. 4:37-1, even at the time he finally made the application following the thought expressed by the two judges. The meritorious question involved was a *388 most important one from the public standpoint. The interest of taxpayers and citizens had certainly not been adequately represented by Vaccaro in consenting to the judgment. The latter received what he had sought in the setting aside of the building permit, and he obviously had not been displeased with the rescission of the sale since it would give him another opportunity to attempt to acquire the lot himself as he had tried to do previously. Moreover, there is no question of timeliness of the application in the light of the original prompt action to review the city's authorizing resolution. The time for appeal of the consent judgment had no bearing. Cf. Lieberman v. Township Committee of Township of Neptune, 50 N.J. Super. 192, 200 (App. Div. 1958).
The city and the corporation contend, however, that, apart from matters of form and place of action, appellant has not demonstrated any right to any relief as a matter of law, and so the granting of their summary judgment motions should be upheld in any event.
Initially, it appears to be suggested that appellant's pleadings are fatally defective in alleging only the ultimate fact of illegality of the municipal action without any details in support of the conclusion. Such an allegation is barely adequate to withstand dismissal (R.R. 4:8-1; 4:9-3). Proper practice dictates setting forth the alleged bases of illegality. However, any such defect could be supplied by a motion for a more definite statement before the responsive pleading (R.R. 4:12-5) or by discovery thereafter, with amendment of pleading if necessary. Our courts are most reluctant to dismiss a complaint initially on technicalities. Jersey City v. Hague, 18 N.J. 584, 601-602, 605 (1955).
Defendants next urge that appellant is barred by the doctrine of res adjudicata, since he seeks to relitigate the same issues which were involved on the cross-claim and disposed of by the consent judgment. The argument is specious. It is, of course, true that a consent judgment has equal adjudicative effect to one entered after a trial or other judicial determination (Public Service Electric and Gas Co. *389 v. Waldroup, 38 N.J. Super. 419 (App. Div. 1955)) and, while a municipal corporation may, under proper circumstances, enter into a consent judgment the same as a private litigant, such a judgment has no conclusive effect if the municipal action was illegal or improper in any respect. 38 Am. Jur., Municipal Corporations, § 727. The mere fact that a judgment was entered by consent does not preclude appropriate inquiry into the validity of the municipal authorization therefor. Such underlying action is subject to the same attack and review as any other governmental act, and the judgment is only as good as the authorizing action. To hold otherwise would be to insulate municipal acts from review, in derogation of the public interest, where they could be contrived to take the form of a judgment by consent. Plaintiff's proceeding seeks review of the underlying action and it cannot be barred by the procedural devices utilized. Nor did the judgment acquire any greater sanctity because a taxpayer, Vaccaro, was a party to the litigation which it ended, for, as we have previously said, his private interest in the outcome deprived his presence as being considered adequate representation of taxpayers generally and of the public interest.
Finally, both the city and the corporation contend that all the proofs on the summary judgment motions established, as matter of law, that the consent judgment represented a settlement of a justiciable issue raised by the cross-claim, i.e., mutual mistake in expressing the conditions and restrictions of sale justifying rescission, and that the action taken by the city to terminate the litigation was in the exercise of good business judgment for the best interests of the city and must be upheld in the absence of actual fraud, bad faith or collusion, which plaintiff did not charge. We give due deference to the elementary rule that governmental action is presumed valid until the contrary is demonstrated, with the burden of proof thereof on the attacking party. We also recognize the fundamental principle that a municipal corporation may, generally speaking, deal with its contracts and adjust and settle claims against it in the same manner *390 as a natural person, provided it acts lawfully and in good faith, but it cannot make a gift of public monies nor grant releases from obligations under the guise of compromising an entirely unfounded claim against it. Carlin v. City of Newark, 36 N.J. Super. 74, 92-93 (Law Div. 1955).
First, let it be commented that what the city did here was not to compromise or settle the corporation's claim made in the cross-claim, but to surrender and capitulate to every aspect of the demand. We should here observe, too, that that portion of the judgment setting aside the building permit was entirely justified in the light of the prior opinion of this court to which situation we have previously adverted.
The city's proofs on its motion for summary judgment sought to justify its action solely on the basis of the desirability of terminating the litigation so the property could be resold. There was no mention or concession that there had actually been a mistake in reducing the building conditions and restrictions to writing in the notice of sale and deed, or that the corporation had any reasonably well founded basis of claim to that effect. This is not surprising in view of the position to the contrary previously taken by Mayor Shebell. Courts will not, of course, substitute their judgment for that of a municipal governing body in matters solely involving questions of judgment, but it is equally clear that possible illegality or avoidance of the spirit or purpose of the laws and principles controlling governmental action cannot escape judicial scrutiny under the guise of business judgment. Asbury Park Press, Inc., v. City of Asbury Park, 23 N.J. 50, 55 (1956). The absence of corrupt motive, or even the presence of good faith, does not alone preclude judicial examination or remedy. Asbury Park Press, Inc., v. City of Asbury Park, supra. It is not inappropriate to point out, also, that it may well be a proper exercise of municipal business judgment to abandon a contract which had not been performed on either side, as in the Carlin case, but quite another to rescind, on that ground alone, a land sale transaction as to which there had been complete performance by the municipality over three years previously. *391 So plaintiff cannot be defeated by mere absence of claim of bad faith or corruption. Whether there was legal justification for the governing body's authorizing resolution on the ground of business judgment may be closely tied in with the question of whether there actually was any real basis for the claim of mutual mistake, about to be discussed, but it is clear to us that, in any event, the issue cannot be disposed of in defendants' favor by the mere affirmative statements in the city's affidavits, and it involved questions of fact only to be determined at a trial.
We are likewise convinced that the summary judgment papers did not "show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law" (R.R. 4:58-3) with respect to defendants' contention that the consent judgment was a proper disposition of the justiciable issue of rescission for mutual mistake raised by the cross-claim. The question has two aspects, one, the matter of the existence of a mistake, and the other, the availability of equitable relief under the circumstances.
It is clear to us that a substantial question of fact was raised by the affidavits, in the light of the prior history which we have recited, as to whether there was bona fide basis for claiming that there had been any mistake here at all (and it would have to be on the theory of mistake of law with respect to the construction of the language used, cf. Nazarro v. Globe and Republic Insurance Co., 122 N.J. Eq. 361 (Ch. 1937)). It will only be after a plenary trial, with all the facts fully developed, that this can be decided. It may turn out that there actually was a mistake, or at least sufficient basis for asserting one, as to warrant the city in terminating the litigation as it did.
As bearing on the question of the proper exercise of business judgment, or the bona fides of the settlement for mutual mistake, we must remember that, even assuming sufficient evidence of basis for a claim of mistake and that rescission was legally permissible under the circumstances (see 5 Williston, Contracts (rev. ed. 1936), § 1557; Conduit *392 and Foundation Corp. v. City of Atlantic City, 2 N.J. Super. 433, 440 (Ch. Div. 1949)), its availability as a remedy further depends on the ability to put the parties in statu quo, which would here mean as the situation existed prior to the sale in May, 1954. The mere lapse of such a length of time in itself militates against the possibility that this status quo could fairly and equitably be restored. Moreover, as plaintiff points out, the change in general economic conditions affecting real estate development of this type might have reduced the likelihood of the city obtaining as favorable a proposition on resale. Also the figures in evidence pose the question of the corporation being permitted to retain profits from the use of the land during the period. Whether these facts existed and whether they were considered by the city, or should have been, and the bearing of all the foregoing on the issues here presented, must await the full development of the facts at a trial.
All in all, there are many very real questions of great importance to the citizens of Asbury Park and the public interest raised by plaintiff's attack on the municipal action. They cannot and should not be disposed of on motions for summary judgment, but as was said by the Supreme Court in a recent case involving other governmental actions of this same municipality, "* * * a more complete expose of the facts and circumstances should be undertaken to satisfy the court that it will make a correct determination. * * *" Asbury Park Press, Inc., v. City of Asbury Park, supra, 23 N.J. at page 56. Cf. State ex rel. Board of Health of Borough of East Paterson v. New Jersey Highway Authority, 26 N.J. 497, 500 (1958). By the same token, plaintiff is not entitled to judgment on his summary motion.
The denial of plaintiff's application to intervene in the Vaccaro suit is reversed and, since all issues are raised and can be expeditiously determined on plaintiff's proposed complaint in intervention and subsequent pleadings and plenary trial therein, the matter is remanded to the Chancery Division with the direction to grant the same and proceed thereon in a manner consistent with this opinion. To clear the record, *393 the granting of defendants' motions for summary judgment in the Edelstein suit is reversed and the denial of plaintiff's similar motion is affirmed. That suit, no longer serving any useful purpose, should be dismissed after the intervention action is at issue. Costs to the appellant.